**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

AMY PHILLIPS,
   Plaintiff,

v.

EXXON MOBIL CORPORATION,
   Defendant.

Case No. 17 C 7703

Judge Jorge L. Alonso

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Amy Phillips ("Phillips") brought this employment discrimination action against Exxon Mobil Corporation ("ExxonMobil") on claims of harassment based on sex and sexual orientation, retaliation, and intentional infliction of emotional distress. [Dkt 1.] Before the Court is ExxonMobil's Motion for Summary Judgment. [Dkt 73.] For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed.[1] ExxonMobil is an oil and gas corporation that operates a refinery in Joliet, Illinois. [Dkt 87, Pl.'s Resp. Def.'s SOF ¶ 1.] Phillips has worked as a process technician at the Joliet Refinery since February 2013. (*Id.* ¶2.) Process technicians are responsible for the safe and effective operation of the plant processing equipment, and work 12-hour shifts with significant physical labor. (*Id.* ¶ 13.) [Dkt. 92, Def.'s Resp. Pl.'s Add'l SOF ¶¶ 81, 82.] They are organized into crews, such as "C Crew" and "D Crew," who work

---

[1] ExxonMobil's motion to strike certain paragraphs of Plaintiff's Statement of Additional Facts on the basis that they contain numerous unrelated facts which are not all supported by citation to the record is denied. Both parties asserted certain facts without citation, and the Court disregards any asserted fact or dispute of fact that is unsupported by the record. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

opposite shifts from each other. (Pl.'s Resp. Def.'s SOF ¶ 14.) Opposite crew shift employees occasionally trade shifts with each other. (*Id.* ¶ 15.) In 2017, Phillips was a member of D Crew. (*Id.* ¶ 16.) Ed Ravens was also a D Crew member in 2016, but he transferred to C Crew in January 2017. (*Id.* ¶16.) Jorge Bahena was the working foreman for the D Crew in 2017, with responsibility for ensuring the crew's work in the field was completed in a safe and timely manner. (*Id.* ¶ 17.) Phillips perceived Bahena to be her supervisor, but according to ExxonMobil, he had no authority to make employment decisions. (*Id.*) In 2016 and 2017, Dave Forneris was the D Crew Zone Supervisor, or front line supervisor, for the crew's process technicians. (*Id.* ¶ 18.) Forneris's responsibilities included directing work activities of hourly employees and appraising their performance, overseeing the progression of process technicians on D Crew, and participating in employment decisions such as hiring, firing, promotions, and discipline. (*Id.*)

### ExxonMobil's Anti-Discrimination Policies

ExxonMobil maintains a policy against harassment in the workplace, and an equal employment opportunity policy prohibiting discrimination and retaliation. (Pl.'s Resp. Def.'s SOF ¶ 4.) Each are given to new employees and are available through ExxonMobil's employee intranet. (*Id.* ¶ 7.) Phillips received training on the policies when she was first hired, and had electronic access to them. (*Id.* ¶¶ 9, 10.) Both policies provide that an employee who believes she has been subjected to inappropriate conduct should report it to her supervisor, higher management, or Human Resources, and both prohibit retaliation for making a report. (*Id.* ¶ 5; Def.'s Exs. 2-5.) According to Phillips, however, after she graduated from the initial training program at ExxonMobil, she and two coworkers were called into a shift superintendent's office and told that if they ever had any problems in the Refinery, they should take them to the working foreman, and

not to Human Resources. (Pl.'s Add'l SOF ¶ 83.) Specifically, she says, the shift superintendent told them that complaints should be kept "in house." (*Id.* ¶ 83.)

### *Phillips's Experience at the Joliet Refinery*

A newly hired process technician at ExxonMobil goes through approximately three months of Refinery technical training during which the technician is qualified on his or her first job post and is at a "Skill Level 1" pay grade. (*Id.* ¶ 19.) Thereafter, process technicians continue to train to become qualified for other higher-skill-level positions within their complex. (*Id.* ¶ 20.) Training is both on-the-job and online, followed by a field test called a "walk through." (*Id.*) After a process technician has qualified for all job posts in his or her complex, the technician sits for a Top Skill Review Board, answering management's questions about the complex as a whole. (*Id.* ¶ 21.) Upon passing, the technician is considered "Top Skill" and receives the highest pay grade for the position. (*Id.*) Although the actual time varies among employees, ExxonMobil has guidelines for the minimum amount of time it should take to reach each skill level, and it generally expects process technicians to reach Top Skill Level. (*Id.* ¶ 22.) Progress typically slows when an employee is frequently absent from work, especially for long periods of time. (*Id.* ¶ 23.) A process technician who is off of work for an extended period of time may be required to undergo certain steps to become requalified for job posts for which she already was qualified. (*Id.* ¶ 23.)

Phillips started working at the Joliet Refinery in February 2013, and progressed to Level 2 on September 30, 2013. (*Id.* ¶ 24.) Phillips took medical leave for about a month in early 2014, and she progressed to Level 3 on September 1, 2014. (Pl.'s Resp. Def.'s SOF ¶¶ 25, 26.) Thereafter, she had additional medical leaves between 2015 and 2017 that totaled about six months. (*Id.*) Due to her absences, Phillips had to go through a requalification process on three occasions before she reached Level 3. (*Id.* ¶ 27.)

According to Phillips, she soon realized that the men in her complex did not want her there, openly mocking her, making statements like "a woman's place is in the home," refusing to tell her when they were going to perform tasks that would help her develop skills, and assessing her differently than her male colleagues. (Pl.'s Add'l SOF ¶ 84.) ExxonMobil disputes the assertions, but it is undisputed that Bahena told employees that he "wears the pants in the family," and occasionally said, "What's up, bitches?" to both male and female crew members. (Def.'s Resp. Pl.'s Add'l SOF ¶ 85.) According to Phillips, other male employees referred to female colleagues as "bitches," "cunts," and "fags." (Pl.'s Add'l SOF ¶ 85.)

In 2016, Phillips observed graffiti on both chairs and equipment in the Refinery stating, "AMY LAZY." (*Id.* ¶ 87.) She complained to Working Foreman Bahena about it. (*Id.*) Bahena talked with the employees he suspected of creating it, and he covered up what he saw. (Def.'s Resp. Pl.'s Add'l SOF ¶ 87.) Bahena testified that although the graffiti he saw was small, it was in in plain view "throughout the complex." (*Id.*; Def.'s Ex. 5, J. Bahena Dep Trans 43:03-44-17.)

According to Phillips, in late 2016, she and Ravens had a verbal altercation while on top of a high tower, and later that day he physically assaulted her. (Pl.'s Add'l SOF ¶ 88.) Specifically, she testified that Ravens told her that "people fall off of towers all the time where it looks like an accident," and later that day he "shoulder-checked" her. (*Id.*; Phillips Dep. 36:06-39:04.) She testified that she reported the incident to Bahena, who said only that Ravens had been stressed about a family issue. (Pl.'s Add'l SOF ¶ 88; Phillips Dep 39:08-40-19.) ExxonMobil disputes this account, and Ravens testified that there was no altercation at all. (Def.'s Resp. Pl's Add'l SOF ¶ 88; Bahena Dep. 82:03-22; Ravens Dep. 65:14-67.)

In October 2016, Phillips told Forneris and Bahena that she was having difficulty getting a walkthrough scheduled for qualification on her final job post. (Pl.'s Resp. Def.'s SOF ¶ 30.)

Walkthroughs take several hours to complete, and although both men and women experienced delays getting walkthroughs during 2016, Phillips complained to her supervisors at the time, including Forneris, that she was being "singled out" for slower progression. (*Id.* ¶¶ 31, 38.) According to Forneris, however, Phillips received similar training as other process technicians, but lagged behind due to her frequent absences. (Def.'s SOF ¶¶ 28, 29; Forneris Decl. ¶ 8.) It is undisputed that two men on Phillips's crew moved more quickly through the process than Phillips did during the same time period. (Def.'s Resp. Pl.'s Add'l SOF ¶ 98.)

In late 2016, Phillips did a partial walkthrough for her final job post with Francisco Orrantia. (*Id.* ¶ 33.) According to ExxonMobil, Orrantia concluded that Phillips needed additional time and training before advancing, but according to Phillips, he made the walkthrough especially difficult for her and then prematurely ended it. (Def.'s SOF ¶ 32; Pl.'s Resp. Def.'s SOF ¶ 32.) Phillips took her Top Skill qualification exam in April 2017, passed her Top Skill Review Board in May 2017, and received her Top Skill Level certification that month. (Pl.'s Resp. Def.'s SOF ¶ 35.) Not all employees pass their walkthrough or Review Board test, and at least one male employee in Phillips' hiring class did not receive his Top Skill certification until more than a year after she did. (*Id.* ¶¶ 37, 38.) Phillips testified that she had no issues with the Top Skill Review Board process. (*Id.* ¶ 35.)

### *The Bicycle Incident & ExxonMobil's Response*

In late February 2017, Phillips discovered that someone had locked up the ExxonMobil bicycle that she used in the refinery and the nearly identical one next to it that had been used by employee Sarah Haynes. (*Id.* ¶ 40; Def.'s Resp. Pl.'s Add'l SOF ¶ 89.) Although the parties dispute whether Phillips complained to her supervisors about the incident and whether they took it seriously, it is undisputed that supervisor Arias told his reports that "horseplay" involving the

bicycles must stop. (Def.'s Resp. Pl.'s Add'l SOF ¶ 89.) Field Safety & Security Group Leader Paul Norie emailed various supervisors stating, "[T]here is no denying this is a form of harassment and it needs attention so the acts cease." (*Id.*)

On March 5, 2017, Ravens admitted that he had locked the bicycles, which he thought were both used by Phillips. (Pl.'s Resp. Def.'s SOF ¶ 41.) According to Ravens, he locked them because he believed Phillips had done the same to him, which she denied. (Def.'s SOF ¶ 40; Pl.'s Resp. Def.'s SOF ¶ 40; Pl.'s Add'l SOF ¶ 90; Def.'s Resp. Pl.'s Add'l SOF ¶ 90.) Regardless, Ravens apologized to both Phillips and Haynes. (Pl.'s Resp. Def.'s SOF ¶¶ 41, 42.) Later that day, Phillips complained to Zone Supervisor Forneris about Ravens, Forneris notified Process Shift Superintendent Art Arias, and together they met with Phillips about her complaint. (*Id.* ¶ 42.)

During the meeting, Phillips reported that: (1) Ravens had accused her of trying to "con" another employee into a bad shift trade and had called her "bitch" in May or June 2016; (2) wrote "Amy Lazy" graffiti in May or June 2016; (3) knocked her hard hat or glasses onto the floor near the lockers on multiple occasions around November 2016; (4) called her a "fucking bitch" when they were working on top of a tower; (5) shoulder checked her after the tower incident as he walked past her; (6) mocked her on November 25 or 26, 2016, for telling other operators that she couldn't do steam traps because she hadn't been shown how; (7) made up a fake shift trade to mock her on December 15, 2016; and (8) shoulder checked her and called her "bitch" when she confronted him about the fake trade that same day. (*Id.* ¶ 43.) She did not complain during the meeting that Ravens had threatened her with physical violence. (*Id.*) Phillips left work before the end of her shift that day because she was so upset. (Def.'s Resp. Pl.'s Add'l SOF ¶ 96.) Although ExxonMobil disputes whether Phillips had previously complained to Forneris about Ravens, she testified that she did. (Def.'s SOF ¶ 45; Pl.'s Resp. Def. SOF ¶ 45; Phillips Dep. 82:16-84:02.)

In any event, it is undisputed that Forneris and Arias promptly notified Scott Carpenter in Human Resources of Phillips's complaint. (Pl.'s Resp. Def. SOF ¶ 45.) Carpenter is the Human Resources Advisor for the Refinery's Process Department, a department he had previously worked in from 1991-2010. (Def.'s Resp. Pl.'s Add'l SOF ¶ 91.) The next day, Carpenter and another Human Resources employee met with Phillips to discuss her complaint. (Pl.'s Resp. Def. SOF ¶ 47.) According to ExxonMobil, Carpenter also contacted Forneris to ensure that Phillips and Ravens would no longer make relief with each other (*i.e.*, neither would ever have to relieve the other; "making relief" requires the relieved technician to interact and share information about what happened during the shift with the relieving technician). (*Id.*) According to Phillips, however, despite telling Human Resources and her supervisors that she felt unsafe around Ravens, she was repeatedly scheduled to make relief with him thereafter which forced her to repeatedly request that the schedule be changed in order to avoid him. (Pl.'s Resp. Def.'s SOF ¶ 47; Def.'s Resp. Pl.'s Add'l SOF ¶ 93.)

Thereafter, Carpenter interviewed Phillips and several other witnesses, reviewed photos of the "Amy Lazy" graffiti, and considered information that both Phillips and Ravens submitted by email. (Pl.'s Resp. Def.'s SOF ¶ 48.) Carpenter and Moreno concluded that the "Amy Lazy" graffiti had occurred in 2016, and that some co-workers had also identified an instance of "Abe Lazy" graffiti, about a male co-worker, Abraham Dubs, but that they could not substantiate whether Ravens had written the graffiti or had done any of the things Phillips complained of beyond the bicycle incident, which he had admitted. (*Id.* ¶¶ 48, 51, 52.)

On April 6, 2017, Ravens received a Step 1 Corrective Action for the bicycle incident and was required to go through refresher harassment training. (*Id.* ¶ 53.) On April 19, 2017, Human Resources met with Phillips to discuss the results of their investigation. They met with her again

at her request on April 28, 2017. (*Id.* ¶ 54.) The parties dispute whether Phillips reported at that time that she believed Ravens was harassing her based on her sex or sexual orientation which Phillips says was common knowledge, but it is undisputed that she told the Human Resources personnel at this meeting that she is a lesbian. (*Id.* ¶ 54; Def.'s Resp. Pl.'s Add'l SOF ¶ 90.) Phillips subsequently thanked Human Resources and Arias for their handling of her complaint. (Pl.'s Resp. Def.'s SOF ¶ 49.) Ravens took a medical leave of absence from May 4, 2017 through July 17, 2017. (*Id.* ¶ 63.)

Shortly after concluding their investigation, Human Resources investigated another complaint of sexual graffiti at the Refinery, this time directed at a male employee in the Maintenance Department. (*Id.* ¶ 56.) In May 2017, management met with employees to remind them that harassment is prohibited, and that if they see graffiti they should report it so that it could be covered up or removed. (*Id.* ¶ 57.) In the months thereafter, however, Phillips observed additional graffiti in the Refinery, including, "AMY FAGGET LAZY RAT BITCH," "DIE AMY DIE RAT BITCH," "AMY LAZY GAY BITCH," "AMY LAZY DIKE," "AMY LAZY CUNT LICK FAG," "AMY LAZY DIKEFAG BITCH," "AMY LAZY DIKE BITCH," and "AMY LAZY DIKE BITCH." (Def.'s Resp. Pl.'s Add'l SOF ¶ 92.) She photographed the graffiti on eight different dates between late May and mid-September 2017. (*Id.*) In August 2017, supervisors emailed that the graffiti could be considered "hostile or harassing," and that it was a "cancer" for the team. (*Id.*)

### *July 2017 Complaint and ExxonMobil's Response*

On July 3, 2017, Phillips sent Carpenter an email stating that she was being "harassed, intimidated & singled out for being a gay woman in my complex," but he was on vacation at the time. (Pl.'s Resp. Def.'s SOF ¶¶ 58, 59, 62.) According to ExxonMobil, this was the first time she

made such a complaint to Human Resources, whereas according to Phillips, her email only reiterated the several complaints she had already made to her supervisors. (*Id*.) On July 6, 2017, Phillips' attorney sent ExxonMobil's General Counsel a letter complaining of: (1) sexual graffiti directed at Phillips; (2) Working Foreman Bahena saying things like, "A woman's place is in the home," and "You should just stay at home like most women"; (3) Refinery supervisors refusing to allow Phillips to test for higher pay positions; and (4) Ravens threatening Phillips by saying, "You know, people can fall off towers, and no one would know anything other than that it was an accident," and calling Phillips a "cunt" during the tower incident. (*Id.* ¶ 60.) Included within the letter were photos of sexual graffiti directed at Phillips. (*Id.* ¶ 61.) Upon receipt of the letter on July 10, 2017, ExxonMobil prepared to conduct an investigation into Phillips's allegations, including reaching out to Phillips to be interviewed, communicating with her attorney, identifying Human Resources personnel outside of the Joliet Refinery to lead the investigation, and preparing a list of witnesses and questions for the investigation. (*Id.* ¶ 64.) Billings Refinery Human Resources Advisor Dona Steadman and Bayton Refinery Human Resources Advisor Mindy Jarvis conducted the investigation. (*Id.* ¶ 65.)

On July 17, 2017, Carpenter read Phillips's July 3 email. (*Id.* ¶ 62.) He informed Human Resources of it and responded to Phillips the next day. (*Id.*) Witness interviews began shortly thereafter. (*Id.* ¶ 66.) ExxonMobil reached out to interview Phillips, but because she wanted her counsel to attend with her, no interview was undertaken. (*Id.*)

On August 9, 2017, Doug Ferrara, another process technician who worked on a different crew, told Phillips that he would not arrive early to make relief with her because she had complained to Human Resources. (*Id.* ¶ 67.) When Phillips's attorney notified ExxonMobil of Ferrara's statement, Steadman and Jarvis immediately investigated and concluded that it

constituted retaliation in violation of ExxonMobil's policies. (*Id.* ¶ 68.) Ferrara, who had no prior discipline, received a "Step 4 Corrective Action" (suspension and final warning) and was required to take a refresher harassment training. (*Id.* ¶ 69.) The parties dispute whether Phillips and Ferrara were scheduled to work together thereafter, although it is undisputed that Phillips had no further issues with him. (*Id.*)

After numerous interviews in August 2017, Steadman and Jarvis issued an investigation report, concluding that although many of Phillips' allegations could not be substantiated, Ravens and Phillips should not be scheduled to work together again. (*Id.* ¶ 70.) They did not identify who had written the graffiti, but they concluded that the Joliet management had taken steps to find and remove it, and had told employees that making graffiti could result in discipline including termination. (*Id.* ¶ 71.) They also concluded that Phillips had herself engaged in inappropriate conduct with Bahena by texting him a joke photo with sexually explicit content. (*Id.* ¶ 72.) Phillips did not report any other allegedly harassing or discriminatory conduct to ExxonMobil thereafter. (*Id.* ¶ 73.)

### *October 2017 Incident and ExxonMobil's Response*

On October 13, 2017, Philips was assigned to a project hauling large hoses onto a compressor deck, approximately eight flights up from the ground. (Def.'s Resp. Pl.'s Add'l SOF ¶ 94.) While the parties dispute the surrounding circumstances, it is undisputed that Phillips tripped and fell while working alone on this task. (*Id.*) The parties also dispute whether Phillips's co-workers ignored her initial calls for help, but it is undisputed that her co-workers ultimately found her when she did not respond to radio calls, and that on-site first responders then took Phillips to the ExxonMobil medical center. (Pl.'s Add'l SOF ¶¶ 94, 95; Def.'s Resp. Pl.'s Add'l SOF ¶¶ 94, 95.) What happened next is also disputed, but it is undisputed that an MRI was ultimately ordered,

and that Phillips later went to a hospital emergency room. (Pl.'s Add'l SOF ¶ 95; Def.'s Resp. Pl.'s Add'l SOF ¶ 95.) It is also undisputed that Human Resources did not conduct an investigation of this incident. (Def.'s Resp. Pl.'s Add'l SOF ¶ 95.) Thereafter, Phillips was approved to take an extended medical leave, and she has not yet been released to return to work. (Pl.'s Resp. Def.'s SOF ¶ 74.)

### *Phillips's Remodeling Business & ExxonMobil's Internal Audit*

ExxonMobil's Standards of Business Conduct contain a conflicts of interest policy applicable to all ExxonMobil employees, which provides that employees must avoid any actual or apparent conflicts of interest between their personal interests and the interests of the company, and that such conflicts should be avoided when dealing with suppliers, customers, competitors, and other third parties. (*Id.* ¶ 77.) Internal Audit has primary responsibility for conducting independent investigations of violations of ExxonMobil's internal controls, including potential violations of its ethics policy and conflicts of interest policy. (*Id.*) Members of Internal Audit are not employees of the Joliet Refinery and are not supervised by Joliet Refinery personnel. (*Id.* ¶ 78.)

In August 2017, ExxonMobil received an anonymous complaint directed to its Global Security Manager that Phillips had an undisclosed personal remodeling business and that she was soliciting work from ExxonMobil employees and contractors. (*Id.*) The complaint was forwarded to the Internal Audit team in Texas to be investigated. (*Id.*) Internal Audit Senior Specialist Brenda Vandervort conducted the investigation into whether Phillips's remodeling business activities violated the company's conflict of interest policy. (*Id.* ¶ 79.) Although she found that Phillips had failed to disclose her business, had performed work for at least one employee, and had solicited work from others, she concluded that there was no conclusive evidence that a conflict of interest violation had occurred, and she closed the investigation with no discipline recommended. (*Id.*)

According to Phillips, however, ExxonMobil, was aware of her business throughout her employment, and she had disclosed it as far back as on her employment application. (*Id.* ¶ 79.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya*, 836 F.3d at 804 (citing *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Id.* at 218 (internal quotation omitted). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint*, 791 F.3d at 767.

# DISCUSSION

According to ExxonMobil, summary judgment should be granted in its favor on Phillips's discrimination claim and claim for punitive damages because she cannot establish that the conduct of her co-workers was based on her sex or sexual orientation, that she timely reported the alleged harassment, or that ExxonMobil failed to conduct an appropriate investigation and take reasonable remedial action when she finally did. [Dkt. 74, Def.'s Mem. at 2-11, 15.][2] It argues that her retaliation claim also fails because no evidence suggests any materially adverse action against her, or that her protected activities were the "but for" cause of any alleged retaliatory action. (*Id.* at 11-14.) Phillips's claim of intentional infliction of emotional distress also fails, ExxonMobil says, because it is preempted both by the Illinois Human Rights Act and the Illinois Workers Compensation Act. (*Id.* at 14-15.)

Phillips opposes the motion, pointing to evidence in the record that she says supports her claim that her co-workers' actions were based on her protected characteristics. [Dkt. 85, Pl.'s Resp. at 3-6.] According to Phillips, ExxonMobil knew of the harassment both because she complained about it and because the graffiti targeting her was open and obvious throughout the Refinery. (*Id.* at 6-10.) Not only did ExxonMobil fail to stop the harassment and act with reckless disregard to her rights, she says, but it got worse with each report she made, and ExxonMobil retaliated against her by slowing her career progression and putting her through an unnecessary ethics investigation. (*Id.* at 10-16, 19-20.) Finally, Phillips argues against preemption of her intentional infliction of

---

[2] ExxonMobil also argued summary judgment is appropriate to the extent Phillips's claim is based on supervisor harassment. (Def.'s Mem. at 3.) Phillips did not respond in opposition, and has accordingly waived the argument. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) (noting general rule that "adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief"); *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011) (party waives arguments not raised in opposition to summary judgment motion).

emotional distress claim because it is based on circumstances that are neither accidental nor inextricably linked to her discrimination claims. (*Id.* at 17-18.)

## I.    <u>Hostile Work Environment</u>

"A sexually hostile or abusive work environment is a form of sex discrimination under Title VII of the Civil Rights Act of 1964." *E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 437-38 (7th Cir. 2012). To succeed on a hostile work environment claim, a plaintiff must demonstrate that: (1) she was subject to unwelcome harassment; (2) the harassment was based on sex or another protected category;[3] (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). For purposes of summary judgment, ExxonMobil focuses its arguments on elements two through four. (Def.'s Mem. at 2-11.) The Court addresses each in turn.

### A.    <u>Based on Sex or Sexual Orientation</u>

According to ExxonMobil, Phillips cannot show that the conduct she complains of was based on her sex or sexual orientation. (Def.'s Mem. at 3.) Her claim must fail, it says, because Ravens testified that he did not know her sexual orientation and because the majority of the other conduct she complains of is unrelated to her sex or sexual orientation. (*Id.* at 3-5.) According to ExxonMobil, it is undisputed that Ravens locked up Phillips's bicycle because he thought she had done the same thing to him, and it was only after Phillips retained a lawyer that she complained of harassment. (*Id.* at 4.) It argues that Phillips's complaints about graffiti and the use of the word "bitch" at the Refinery also do not support her claim because the only evidence those things were

---

[3] "[D]iscrimination on the basis of sexual orientation is a form of sex discrimination" and is actionable under Title VII. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 340-41 (7th Cir. 2017) (*en banc*).

based on a protected characteristic is her own opinions, and because there is evidence in the record that male employees also were targets of similar slurs in graffiti. (*Id.* at 4-5.) Phillips disputes these contentions, arguing that the bicycle incident was just one of several that targeted her on the basis of sex and sexual orientation, creating a hostile work environment. (Pl.'s Resp. at 3-4.) According to Phillips, the words used against her and the graffiti in the Refinery utilized sex-based terms and sexually explicit slurs which is itself evidence of sexual harassment. (*Id.* at 5.) That a few instances of other graffiti existed in the Refinery, she says, does not defeat her claim. (*Id.* at 5.)

Viewing the record in the light most favorable to Phillips, there is sufficient evidence from which a reasonable factfinder could conclude that the conduct Phillips complains of was based on her sex or sexual orientation. *See Robinson*, 894 F.3d at 828. The bicycle incident is not the only incident of which Phillips complains nor can it be viewed in isolation. *See Heneghan v. City of Chi.*, No. 09 C 759, 2010 WL 5099969, *4 (N.D. Ill. Dec. 8, 2010) (finding disputed issue of whether conduct, taken as a whole, was "just offensive or if it was harassment based on sex"). In addition, Phillips submits evidence that she was repeatedly referred to as a "bitch" and "cunt" by coworkers including Ravens, and that she encountered graffiti throughout the Refinery including "AMY LAZY CUNT LICK FAG," "AMY LAZY DIKEFAG BITCH," "AMY LAZY GAY BITCH," "AMY CUNTLICKER," "AMY LAZY DIKE," and her name next to a drawing of a penis ejaculating on a woman. (Def.'s Resp. Pl.'s Add'l SOF ¶ 92.)

The Seventh Circuit has long since rejected the argument that a female plaintiff subjected to sex-based slurs must produce more evidence than the words themselves. *See Passananti v. Cook County*, 689 F.3d 655, 665-66 (7th Cir. 2012). As the Court made clear, "A raft of case law establishes that the use of sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch,' has been consistently held to constitute harassment based upon sex." *Id.*

(internal quotation omitted). While ExxonMobil correctly notes that the use of the word "bitch" does not on its own constitute sexual harassment or create a hostile work environment—for example, when the word is hurled at men and women alike—it is well settled that context is key in making that determination. *Passananti*, 689 F.3d at 666; *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016) ("What matters is . . . whether a reasonable factfinder could infer from [the] facts that the plaintiff was harassed 'because of sex'") (internal quotation omitted). Here, Phillips presents sufficient evidence from which a factfinder could conclude that the conduct directed at her, including sexually degrading slurs and anti-gay epithets, showed hostility to her based on her sex or sexual orientation. *Passananti*, 689 F.3d at 666; *Davis v. Packer Eng'g, Inc.*, No. 11-7923, 2018 WL 1784131 (N.D. Ill. April 12, 2018) (finding testimony that plaintiff was called a "bitch" and "sexually dangerous woman" sufficient to support jury's conclusion that conduct was directed at plaintiff because of her sex).

ExxonMobil tries to avoid this conclusion by arguing that under *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000), the presence of graffiti targeting men in the Refinery defeats Phillips's discrimination claim. (Def.'s Mem. at 4-5.) According to ExxonMobil, because an instance of graffiti called a male co-worker lazy, and another included a man's name and "SAD," which was understood to mean "suck a dick," similar graffiti directed at Phillips cannot show targeting because of her sex or sexual orientation. (*Id.*) In *Holman*, the Seventh Circuit made clear that "because Title VII is premised on eliminating *discrimination*, inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit." *Holman*, 211 F.3d at 403. Instead, the Court reasoned, "The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment

*to which members of the other sex are not exposed.*" *Id.* (quoting with emphasis *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Unlike in *Holman*, evidence in the record supports Phillip's claim that the harassment she allegedly endured was far more severe and prevalent than the isolated incidents of graffiti against two of her male colleagues. (Pl.'s Resp. Def.'s SOF ¶¶ 40-44, 55, 67; Def.'s Resp. Pl.'s SOF ¶¶ 85, 87-90, 92.) The single instance of graffiti labeling a male co-worker lazy is not sex-based, and the single instance of graffiti using the expression "SAD" against a co-worker is not as explicit or threatening as what was allegedly directed at Phillips. In addition to substantially more graffiti of a graphic, sexual, and sexist nature, evidence in the record supports Phillips's claim that she was ridiculed and isolated by her coworkers, that Ferrara threatened to intentionally stall relieving her, and that Ravens "shoulder-checked" her, knocked her equipment down, threatened her with physical violence, and teased her for being unable to do certain things. (Pl.'s Resp. Def.'s SOF ¶¶ 40-44, 55, 67; Def.'s Resp. Pl.'s SOF 85, 87-90, 92.) Accordingly, Phillips has raised a genuine issue of material fact as to whether the conduct she complains of was based on her sex or sexual orientation. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940-41 (7th Cir. 2007) (reversing summary judgment for employer where evidence supported female plaintiff's claim that she was subjected to more extensive harassment than male co-workers); *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921 (N.D. Ill. 2014) (denying summary judgment where reasonable factfinder could conclude that conduct directed at plaintiff was significantly more severe than what may have been directed at male employees).

## B.     Severe or Pervasive Conduct

ExxonMobil also argues that summary judgment should be granted because Phillips fails to demonstrate that the complained of conduct was sufficiently severe or pervasive. (Def.'s Mem.

at 5-7.) According to ExxonMobil, the undisputed evidence shows that the allegedly harassing conduct Phillips reported was limited to a handful of occasions, isolated in time, and limited to only one known coworker, Ravens. (*Id.* at 6.) Even his alleged physical threat is not enough to support her claim, ExxonMobil continues, because Phillips did not report it at the time or when she met with Human Resources about him, and because she felt comfortable enough to confront him months after the incident had allegedly occurred. [Dkt 91, Def.'s Reply at 7.] Phillips disputes these assertions, arguing that evidence in the record demonstrates the harassment she faced came from more than one employee and spanned several years. (Pl.'s Resp. at 9.) Not only is the graffiti itself enough to demonstrate severe or pervasive harassment, she argues, but it is further supported by evidence that she faced acts of intimidation, isolation, and the threat of physical violence. (*Id.* at 9.)

To rise to the level of actionable hostile work environment, the complained of conduct must have been sufficiently severe or pervasive to have altered the conditions of employment and created an abusive working environment. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). "In determining whether conduct is severe or pervasive enough to alter the conditions of employment, courts must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson*, 894 F.3d at 828; *accord Johnson*, 892 F.3d at 900. The "requirement is disjunctive, not conjunctive; the standard may be met by a single extremely serious act of harassment or by a series of less severe acts." *Robinson*, 894 F.3d at 828. "[T]here is no magic number of incidents required to establish a hostile environment." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a

question of fact for the jury." *Johnson*, 892 F.3d at 901. "If a reasonable jury could find that the conduct was severe or pervasive, then the claim must go to trial." *Robinson*, 894 F.3d at 828.

At the outset, the Court notes that consideration of each complained of act separately, as ExxonMobil asserts, views the evidence with the wrong lens. "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chi.* 713 F.3d 325, 331 (7th Cir. 2013) (internal quotation omitted). Instead, the Court must examine all of the circumstances presented and consider their context as a whole. *Id*; *accord Robinson*, 894 F.3d at 828. "Context matters, and it will often present a jury question." *Passananti*, 689 F.3d at 669. Viewed with the proper lens, Phillips presents sufficient evidence to warrant a jury's determination of her claim.

Specifically, Phillips points to evidence that her co-workers called her "bitch" and made sexist comments to her like telling her that a woman's place was in the home, and that Ravens mocked her inability to do certain tasks, repeatedly knocked her hard-hat and glasses on the floor, shoulder-checked her, and threatened her with physical violence. (Pl.'s Resp. Def.'s SOF ¶¶ 40-44; Def.'s Resp. Pl.'s SOF ¶¶ 85. 87) She testified that graffiti appeared in the Refinery with a drawing of a penis ejaculating on her, calling her "bitch," "dyke," and "rat," telling her to "suck a dick" and "die," and that it got worse after she complained. (Pl.'s Resp. Def.'s SOF ¶ 55; Def.'s Resp. Pl.'s SOF ¶¶ 87-90, 92.) Her testimony is supported by photos in the record, as well as the testimony of Bahena. (Pl.'s Resp. Def.'s SOF ¶ 55; Bahena Dep. 43:03-44:17; Pl.'s Exs. 11, 12.) In addition, she testified that her co-workers isolated her and that her professional development and advancement was slowed as compared to male peers. (Pl.'s Resp. Def.'s SOF ¶¶ 29; Phillips Dep. 35:18-29:07, 43:19-46:08.)

Nor is the Court convinced by ExxonMobil's argument that the graffiti was not severe or pervasive enough to render the work environment hostile. (Def.'s Reply, at 8.) It is not only the fact of the words and the graphic imagery, but also the other contextual evidence in the record that supports Phillips's assertion of severe and pervasive conduct. *See Passananti*, 689 F.3d 666 (finding repeated use of the word "bitch" in context evidence sufficient to allow jury to infer it was derogatory to woman); *Boumehdi,* 489 F.3d at 789 (reversing summary judgment for employer and finding plaintiff's testimony that supervisor made at least 18 sexist or sexual comments in less than a year and that similar comments were often made sufficient to show hostile work environment); *Meng v. Aramark Corp.*, No. 12 C 8232, 2015 WL 1396253, *7 (N.D. Ill. March 24, 2015) (finding graffiti depicting female plaintiff in graphic sexual way along with online reproductions and jokes about it sufficient to show a hostile work environment, despite its quick removal).

As the Seventh Circuit has recognized, "intimidating words or acts[,] obscene language or gestures[, and] pornographic pictures," lie on the actionable side of the line that divides "the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000) (internal quotation omitted). Unlike in ExxonMobil's cited authorities, the conduct directed at Phillips included more than just the label of "dyke" or "fag," but also pornographic imagery, statements that she should "suck a dick," and "die," and an alleged physical threat and assault. (Pl.'s Resp. Def.'s SOF ¶ 55; Def.'s Resp. Pl.'s SOF ¶¶ 87-90, 92.) A reasonable jury could find on this record that the complained of conduct was sufficiently severe or pervasive within the meaning of Title VII.

This Court is similarly unpersuaded by ExxonMobil's argument that the alleged tower incident with Ravens could not be severe or pervasive. (Def.'s Reply at 7.) Contrary to

ExxonMobil's assertion, it is not clear from the record that Phillips was comfortable discussing her differences with Ravens. (*See id.*) Instead, Phillips testified that she felt compelled by the severity of the situation to try to discuss it with him, but that when she did he called her names like "stupid bitch," and "cunt rat." (Pl.'s Resp. Def.'s SOF ¶ 44; Phillips Dep. 65:05-67:22.) Further, unlike ExxonMobil's cited authorities, because Phillips presents evidence of sex-based hostility from Ravens and others, it cannot be said that his alleged threat during the tower incident necessarily lacks any connection to her protected characteristics. (*See* Def.'s Mem. at 7.) Finally, whether Ravens denies that he ever threatened her, or whether Phillips's description of the incident has varied over time are credibility issues inappropriate for summary judgment. *See Johnson*, 892 F.3d at 901.

### C. Employer Liability

ExxonMobil also argues that Phillips cannot establish a basis of its liability because she unreasonably delayed reporting any alleged harassment in 2016, and when she finally complained in March 2017, the company promptly investigated and appropriately responded. (Def.'s Mem. at 7-11, n. 9.) According to Phillips, however, she repeatedly complained about the way she was being treated, first to Working Foreman Bahena, then to Zone Supervisors Arias and Forneris, and ultimately to Human Resources. (Pl.'s Resp. at 10-12.). Moreover, she says, the graffiti was open and obvious throughout the Refinery, so even if she hadn't complained, ExxonMobil had to have known about it. (*Id.* at 13.) Rather than putting an end to it, she says, at each stage ExxonMobil gave only the most minimal response, which not only failed to stop the behavior but actually made it worse. (*Id.* at 11-14.)

Where an employee complains of co-worker harassment, the employer is liable only if it is negligent in discovering or remedying the harassment. *Lambert v. Peri Formworks Sys., Inc.*, 723

F.3d 863, 866 (7th Cir. 2013) (citing *Vance v. Ball State Univ.*, 570 U.S. 421 (2013)). Accordingly, a plaintiff alleging co-worker harassment must offer evidence either that she made a concerted effort to inform the employer that a problem exists, or that it knew or should have known of the harassing conduct yet failed to act. *Nischan v. Stratosphere Quality LLC*, 865 F.3d 922, 931 (7th Cir. 2017). "Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Lambert*, 723 F.3d at 866 (internal citation omitted). "Once aware of workplace harassment, 'the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" *Vance v. Ball State U.*, 646 F.3d 461, 471 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2014)).

According to ExxonMobil, Phillips failed to report any alleged harassment by Ravens or any alleged graffiti in 2016. (Def.'s Mem. at 8-9.) Emphasizing the multiple means of reporting under its harassment policy and Phillips's access to and training on it, ExxonMobil argues that it cannot be liable for conduct she failed to complain of pursuant to its policy. (*Id.* at 8-9, 11 n.9.) Phillips disputes this position, arguing that whether she complained through the channels set out in ExxonMobil's policy is not the only relevant issue because she and other employees were affirmatively told not to use those channels. (Pl.'s Resp. at 10-11.) Instead, she says, they were told to keep complaints "in house" by bringing them to the attention of the working foreman. (*Id.* at 11.) According to Phillips, she did so by complaining to Bahena, and the harassment only got worse as a result. (*Id.* at 10.) ExxonMobil rejects this claim as unsupported, and emphasizes that

because Bahena was not a supervisor, notice to him could not be deemed notice to the company. (Def.'s Reply at 10-12.)

The Seventh Circuit addressed a similar dispute in *Lambert*, 723 F.3d 863. In that case, the trial court had entered summary judgment for the employer where a yard laborer had complained of harassment only to the yard lead who was not empowered as a supervisor with authority to change the conditions of employment. *Id.* at 866. The Seventh Circuit reversed, finding that whether the yard lead was a supervisor whose conduct might be attributable to the company was not the issue. *Id.* at 867. Instead, it held, the question was whether the plaintiff reasonably expected that the yard lead "had the responsibility to, and would, refer his complaints to someone who could address the problem—either the yard manager, the logistics manager, or the human resources manager." *Id.* Because the yard lead had testified about his additional responsibilities and the general expectation that he would report problems in the yard to the yard manager, a genuine issue of fact existed as to whether the plaintiff had adequately put the company on notice by complaining to him. *Id.* at 867-68.

Here too, whether Phillips's complaints to the working foreman adequately put ExxonMobil on notice is an issue to be determined at trial. Phillips testified that she and other new employees were specifically told not to follow the written policy but instead to keep any complaints in-house by bringing them to the working foreman. (Pl.'s Resp. Def.'s SOF ¶ 10; Pl.'s Add'l SOF ¶ 83; Phillips Dep. 101:04-102:18; Phillips Decl. ¶ 8.) Employee Sara Haynes testified similarly. (Haynes Dep. at 57:13-58:15.) Employee Marguerite Kurowski testified that it was a refinery rule to report graffiti to the working foreman. (Kurowski Dep. 42:06-43:18.) Bahena testified that as a working foreman, he had responsibility for training and overseeing four units of crew. (Pl.'s Resp. Def.'s SOF ¶18; Bahena Dep. 14:05-16:06.) On this record, a jury could

conclude that Phillips reasonably believed she was supposed to report her complaints to Bahena, and that if he could not fix the situation he would be obliged to report it to someone who could. *See Lambert*, 723 F.3d at 867-68*; accord Young v. Bayer Corp.*, 123 F.3d 672, 675 (7th Cir. 1997).

A genuine issue of material fact also exists as to the adequacy of ExxonMobil's response after it says it received notice of Phillips's complaint. According to ExxonMobil, once Phillips complained to Zone Supervisors Arias and Forneris in March 2017, they informed the Human Resources Department which in turn promptly investigated and appropriately responded. (Def.'s Mem. at 9-10.) As a result, ExxonMobil says, Phillips never had to work with Ravens or Ferrara again, and she had no further complaints about them. (*Id.*) Phillips disputes these claims, pointing to evidence that Arias and Forneris initially dismissed the incidents as horseplay, and arguing that even after she retained counsel, ExxonMobil's investigation was cursory and intended only to whitewash the situation, not to remedy it. (Pl.'s Resp. at 12-13.) According to Phillips, ExxonMobil investigators were not given her complete complaints or allowed to enter the Refinery, did not analyze the graffiti handwriting, add more security or cameras to the Refinery, or otherwise try to identify the perpetrators even when witnesses suggested that Ravens or Ferrara had done it. (*Id.* at 13-14; Pl.'s Resp. Def.'s SOF ¶¶ 70, 71.) The investigation yielded little results because it was so limited, she says, and as a result, the actions against her only got more frequent as her male co-workers retaliated for her complaints. (Pl.'s Resp. at 14.) Further, she says, ExxonMobil continued to assign her to make relief with Ravens and Ferrara, and when she sought Human Resources help with the schedule, she was told to handle it herself. (*Id.* at 13.)

An employer's course of conduct in response to a complaint need not be perfect, but it must not be negligent. *Johnson*, 892 F.3d at 907. "[T]he question as to whether an employer's response was reasonably likely to end the harassment is fact specific and must be analyzed

according to a totality of the circumstances review." *Johnson*, 892 F.3d at 908. The gravity of the situation sets the reasonableness of the remedy, and in this case depends heavily on the credibility of the witnesses to the alleged conduct. *See Heneghan*, 2010 WL 50999969, *7. A jury may find that ExxonMobil should have empowered its investigators to take additional action, or ensured not only that Ravens and Ferrera did not directly work with Phillips, but also that they did not make relief with her. To make this determination, a jury must assess among other things the import of making relief with other workers, and determine whether it believes Phillips that Ravens threatened and physically assaulted her, or whether it believes Ravens that these things never happened.[4] Weighing the credibility of the witnesses is not appropriate on summary judgment. *Johnson*, 892 F.3d at 901.

For each of these reasons, ExxonMobil's motion for summary judgment on Phillips's discrimination claim (Count I) is denied.

## II.  Retaliation

ExxonMobil argues summary judgment should be granted on Phillips's retaliation claim because no evidence suggests she suffered a materially adverse action that was a result of her harassment complaint. (Def.'s Mem. at 11-14.) Phillips opposes the motion, arguing that as a result of her complaint, she faced increased co-worker harassment and a delayed meaningful response from ExxonMobil, delayed skills testing necessary to qualify for advancement, and a stressful and unnecessary ethics investigation regarding her personal remodeling business. (Pl.'s Resp. at 14-17.) ExxonMobil argues that none of these are materially adverse, and in any event, there is no

---

[4] This does not mean that ExxonMobil was obliged to identify and punish the graffiti perpetrator(s) as Phillips argues. "[T]itle VII requires only that employers take action reasonably calculated to stop unlawful harassment; that requirement does not necessarily include disciplining employees responsible for past conduct." *Muhammed v. Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014).

evidence from which a reasonable jury could conclude that Phillips's complaint was the "but for" reason for them. (Def.'s Reply at 15-19.) The Court need not address whether the acts Phillips identifies as retaliatory were materially adverse, because even if they were, her claim fails for lack of evidence of causation.

Title VII prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e-3(a); *Lord*, 839 F.3d at 563. "In order to make out a claim for retaliation, a plaintiff must demonstrate (1) that he engaged in statutorily protected activity; (2) that his employer took a materially adverse action . . . against him; and (3) that the protected activity and the adverse action are causally connected." *Robinson*, 894 F.3d at 830 (internal footnote omitted).

To prove causation, the plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. The requirement of but-for causation "does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014). For each circumstance, however, Phillips fails to provide evidence supporting the requisite causal connection.

Specifically, Phillips argues that co-worker harassment increased after she complained about it, and ExxonMobil delayed any meaningful response following her March 2017 meeting with Human Resources. (Pl.'s Resp. at 15.) Although she points to evidence that those things took place after her discrimination complaint, she cites no evidence that suggests they were because of

it. To be sure, Phillips identifies multiple additional investigation steps ExxonMobil could have taken and cites evidence supporting that those steps were not taken, but she identifies no facts which suggest a retaliatory motive in the way her complaints were handled. (*See id.*; Pl.'s Resp. Def.'s SOF ¶¶ 47-48, 70, 79-80.)

Similarly, Phillips maintains that her progression to Top Skill was deliberately delayed because she had complained to Working Foreman Bahena of sex-based harassment. (Pl.'s Resp. at 16.) It is undisputed, however, that male and female process technicians experienced delays getting walkthroughs during the same time period in which she sought one. (Pl.'s Resp. Def.'s SOF ¶ 31.) Although Phillips argues that her progression was even slower that others and that her testing was more complex because of her prior complaints, she cites no evidence to support any causal connection to them. (*See* Pl.'s Resp. at 16 (citing Pl.'s Resp. Def.'s SOF ¶¶ 10, 17, 29, 87-88).)

Finally, Phillips maintains that ExxonMobil knew all along about her personal remodeling business and only launched an investigation into it in retaliation for complaining of harassment. (Pl.'s Resp. at 16.) However, it is undisputed that ExxonMobil's Internal Audit department received an anonymous report not only that she maintained a personal business, but also that she was soliciting bids from ExxonMobil employees and contractors which potentially violated its conflict-of-interest policy. (Pl.'s Resp. Def.'s SOF ¶¶ 77-78.) It is also undisputed that the Internal Audit department tasked with investigating the report is located out of state and is not supervised by Joliet Refinery personnel, and that the audit specialist who investigated had no knowledge of Phillips's complaint. (Pl.'s Resp. Def.'s SOF ¶¶ 78-80.) Although she argues that Human Resources employee Carpenter caused the conflict-of-interest investigation after he too was implicated in Phillips's complaint, she identifies no facts in the record to arguably support her

assertion. (*Id.*) Without evidence from which a reasonable jury could conclude that her protected activities were the reason for conduct she complains was retaliatory, the claim must fail.

For these reasons, ExxonMobil's motion for summary judgment on Count II is granted.

## III.   Intentional Infliction of Emotional Distress ("IIED")

ExxonMobil also moves for summary judgment on Phillips's intentional infliction of emotional distress claim on the ground that it is preempted both by the Illinois Workers' Compensation Act, 820 ILL. COMP. STAT. ANN. § 305/1 *et seq.* ("IWCA"), and the Illinois Human Rights Act, 775 ILL. COMP. STAT. ANN. § 5/1-101 *et seq.*, ("IHRA"). According to ExxonMobil, it is preempted by IWCA because Phillips cannot demonstrate that her alleged injuries were not accidental within the meaning of the Act, and it is preempted by IHRA because Phillips cannot prove her IIED claim independent of the duties IHRA creates. (Def.'s Mem. at 14-15.) Phillips argues against preemption on either front because "she alleges circumstances separate from accidental injuries, in the case of the IWCA, or her sex-based claims, with respect to the IHRA." (Pl.'s Resp. at 17-18.) Moreover, she says, ExxonMobil's investigation of her remodeling business and its handling of her October 2017 fall at work separately support her IIED claim. (*Id.*)

"The IWCA is an employee's exclusive remedy for 'accidental' injuries arising out of and in the course of employment." *McPherson v. City of Waukegan*, 379 F.3d 430, 442 (7th Cir. 2004). An IIED claim is thus preempted under IWCA where an employee's tortious conduct was "accidental" within the meaning of the Act. *See Meerbrey v. Marshall Field & Co., Inc.*, 564 N.E.2d 1222, 1226 (Ill. 1990). "[I]njuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the Act, since such injuries are unexpected and unforeseeable from the injured employee's point of view." *Id.* They are also "'accidental' from the employer's point of view, at least where the employer did not directly or expressly authorize the

28

co-employee to commit the assault." *Id.* On the other hand, intentional torts are not accidental from the employer's perspective when either the employer directly authorized the tortious behavior or the employer's alter-ego committed the action. *Id.*

Accordingly, to avoid preemption Phillips must show that ExxonMobil "committed, commanded, or expressly authorized" the tort against her. *See McPherson*, 379 F.3d at 442. ExxonMobil argues that Phillips cannot meet this standard because of its anti-harassment policies, and its remedial response when she reported her complaint. (Def.'s Mem. at 14.) Notably, Phillips's reliance on her allegations in opposition both fails to address the thrust of ExxonMobil's argument and is insufficient at summary judgment where she is required to "show what evidence [she] has that would convince a trier of fact to accept [her] version of events." *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) (internal quotation omitted). Because she fails to develop an argument and cites no evidence from which it can be said that ExxonMobil "committed, commanded, or expressly authorized" the conduct she complains of, her claim is preempted under IWCA. *See McPherson*, 379 F.3d at 442; *Hunt-Golliday v. Metro. Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1017 (7th Cir. 1997).

Even if she could avoid preemption under IWCA, Phillips's IIED claim would nevertheless fail. The IHRA provides: "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILL. COMP. STAT. ANN. § 5/8-111(D). As the Seventh Circuit has explained, this provision "tells us that the 'subject' of an alleged 'civil rights violation' must be heard under the procedures of the Act. *Richards v. U.S. Steel*, 869 F.3d 557, 562-63 (7th Cir. 2017). "[W]hether [a] court may exercise jurisdiction over a tort claim depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act

itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997). The essential question to be asked is "whether the plaintiff can prove the elements of the tort '*independent* of any legal duties created by the [IHRA].'" *Richards*, 869 F.3d at 564 (quoting *Maksimovic*, 687 N.E.2d at 24).

According to ExxonMobil, Phillips cannot meet this standard because she conceded in her deposition that the injuries she alleges all arose from ExxonMobil's alleged discriminatory and retaliatory actions. (Def.'s Mem. at 14-15.) Phillips does not dispute this, and this Court agrees that the conduct she complains of is inextricably linked to her discrimination and retaliation claims. (Pl.'s Resp. at 17-18; Pl.'s Resp. Def.'s SOF ¶ 75.) Phillips urges, however, that ExxonMobil's investigation of her remodeling business and its handling of her 2017 fall at work separately support her claim. (Pl.'s Resp. at 18.)

"Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress." *Richards*, 869 F.3d at 566 (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (2003)). In the employment context, Illinois courts are hesitant to conclude that conduct is extreme and outrageous unless an "employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Richards*, 869 F.3d at 567 (internal quotation omitted). The fear is that, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (internal quotation omitted).

Under these authorities, neither circumstance can be considered extreme and outrageous. For all of the reasons discussed in Section II above, no evidence in the record supports the conclusion that that ExxonMobil's investigation of Phillips's remodeling business was retaliatory in nature or that it served no legitimate purpose, and no evidence suggests that any co-worker present the day Phillips fell or that any health center worker who interacted with her knew of her discrimination claim, let alone treated her a certain way because of it. (*See supra* Sect. II.)

Accordingly, ExxonMobil's motion for summary judgment on Phillips's IIED claim (Count III) is granted.

## IV. Punitive Damages

Finally, ExxonMobil argues that Phillips's request for punitive damages must fail because there is no evidence that it acted with the requisite malice or reckless indifference to her rights under federal law, nor is there a basis for imputing liability to it based on agency principles. (Def.'s Mem. at 15.) According to ExxonMobil, its good faith efforts to prevent harassment and its prompt and remedial actions in response to Phillips's complaint negate any claim of malice or reckless indifference. (*Id.*) Phillips argues in opposition that ExxonMobil acted with the requisite culpability because it understood that discrimination and retaliation violated federal law, and yet it failed to enforce its own antidiscrimination policies and instructed her and others not to follow them. (Pl.'s Resp. at 18-20.) According to Phillips, despite its anti-discrimination policies, ExxonMobil set up a Human Resources department that employees feared and distrusted, failed to take her complaints seriously, continued to place her in harm's way, failed to impose meaningful discipline on her harassers, and otherwise took no meaningful steps to convey to employees that there would be consequences for continued harassment. (*Id.*) ExxonMobil rejects these arguments,

asserting that the undisputed record demonstrates its good faith efforts to create a harassment-free workplace. (Def.'s Reply at 20.)

Punitive damages are available under Title VII when a plaintiff demonstrates that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). An employer may not be vicariously liable for the discriminatory actions of its managerial agents if the employer can show that those actions are contrary to the employer's "good-faith efforts to comply with Title VII." *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 545 (1999) (internal quotation marks omitted). While evidence of an employer's anti-discrimination policy is "relevant to evaluating whether it engaged in good faith efforts to comply with Title VII, it is not sufficient in and of itself to insulate [it] from a punitive damages award." *E.E.O.C. v. Mgmt. Hospitality*, 666 F.3d at 438.

For the reasons discussed above, questions of fact remain as to whether ExxonMobil adhered to its anti-discrimination policies, how it was notified of Phillips's complaints, and the adequacy of its response to them. (*See supra,* Sect. I.) Evidence that an employer refused to remedy or ignored complaints of harassment can establish an employer's lack of a good-faith effort. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848 859-61 (7th Cir. 2001) (reasonable jury could conclude that defendant did not engage in good-faith effort to comply with Title VII where evidence suggested that defendant refused to remedy plaintiff's harassment despite knowing about it). Accordingly, it would be premature to conclude whether ExxonMobil's response demonstrated a good-faith effort to comply. The motion is therefore denied as to this claim.

## CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [73] is granted in part and denied in part. Counts II and III are dismissed with prejudice. A status is set for April 22, 2020 at 9:30 a.m. to discuss scheduling the case for trial. The parties are directed to exhaust all settlement possibilities prior to the status hearing.

Date:  3/25/2020

_____
Jorge L. Alonso
United States District Judge